UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-80033-CR-MIDDLEBROOKS/BRANNON

UNITED STATES OF AMERICA

v.

BARRY GREGORY,

      **Defendant.**

_____/

## FACTUAL PROFFER

Defendant Barry Gregory, his counsel, and the United States agree that, had this case proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt, and the following facts are true and correct and are sufficient to support a plea of guilty:

1. At all times relevant to the Information, substance abuse treatment was regulated under state and federal law. Pursuant to Florida's Marchman Act, appropriate substance abuse treatment needed to be "a professionally directed, deliberate, and planned regimen of services and interventions that are designed to reduce or eliminate the misuse of drugs and alcohol and promote a healthy, drug-free lifestyle." Fl. Stat. 397.311(a).

2. At all times relevant to the Information, the Marchman Act made it unlawful for any person or agency to act as a substance abuse service provider unless it was properly licensed. Fl. Stat. § 397.401(1); Fl. Admin. Code § 65D-300.003(1)(a).

3. To insure the legitimacy of substance abuse service providers and to protect the health and welfare of patients, all substance abuse service provider personnel, including all owners, directors, and chief financial officers, had to pass a "level 2 background screening," including "fingerprinting for statewide criminal history records checks through the Department of Law Enforcement, and national criminal history records checks through the Federal Bureau of Investigation." Fl. Stat. §§ 397.451(1)(a)(1), 435.04(1)(a). The Act also made it a criminal offense to operate or attempt to operate as a service provider with personnel who did not pass the background test. Fl. Stat. § 397.403(1)(e)(1); 397.461. Despite these laws, the substance abuse treatment centers mentioned in the Information, Journey to Recovery ("Journey") and Reflections Treatment Center ("Reflections"), applied for and received licenses and operated as service providers by hiding the fact that co-conspirator Kenneth Chatman, who had a prior federal felony conviction, owned Journey and Reflections and was their Chief Operating Officer.

4. The Patient Protection and Affordable Care Act of 2010 ("ACA"), Pub. L. 111-148, and other federal laws expanded the availability of private insurance to pay for substance abuse treatment in several ways. First, the ACA allowed parents to maintain health insurance for their children through their own insurance policies until the children reached the age of 26.

Second, federal law mandated that substance abuse treatment and other mental health treatment must be covered and reimbursed by insurance policies in the manner and at the same levels as other medical treatment. Third, the ACA required insurance companies to cover individuals regardless of prior existing conditions. Fourth, annual and lifetime caps on coverage were removed. Fifth, the ACA created insurance exchanges that allowed uninsured individuals to apply for and obtain coverage from private insurers. The combination of these provisions created insurance coverage for patients and substance abuse treatment that had previously been excluded from coverage. Federal health care benefits programs were likewise expanded.

5. These federal laws created access to coverage through a number of avenues, including health plans sponsored by private employers, federal health care benefits programs, and health plans offered directly by private insurance companies. Private insurance companies administer health plans sponsored by private employers and governmental employers. Health plans sponsored by private employers are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, while those sponsored by governmental employers and certain others are exempted from ERISA's jurisdiction.

6. The Federal Employees Health Benefits Program ("FEHBP") provided medical benefits, items and services to federal employees and their dependents, including substance abuse services. The United States Office of Personnel Management ("OPM") managed the FEHBP and contracted with various insurance companies to offer these benefits. FEHBP reimbursed those insurance companies out of government funds for the money the insurance companies paid out for medical benefits, items and services for federal employees and their dependents. BlueCross/BlueShield (BCBS) was one of the various insurance companies contracted by the Office of Personnel Management to offer medical benefits, items and services to federal employees under the FEHBP.

7. The National Railroad Passenger Corporation, doing business as Amtrak ("Amtrak"), was a private, for profit, Government corporation, that operated a nationwide system of passenger rail transportation. As part of its employee benefits package, Amtrak established employee health and welfare benefit plans to provide healthcare to their employees, including their spouses, domestic partners, and dependent children (collectively, "dependents").

8. Both ERISA and non-ERISA health benefit plans, including ACA plans, were offered or administered by private insurance companies, including Blue Cross/Blue Shield, Aetna, Cigna Behavioral Health, Cigna Health & Life Insurance Company, United Behavioral Health, and United Health Group.

9. All of these health benefit plans were "health care benefit programs," as defined in Title 18, United States Code, Section 24(b), that is, "public or private plans or contracts, affecting commerce, under which any medical benefit, item or service is provided to any individual."

10. Regardless of the type of plan held by a patient, the amount of coverage and terms and conditions of billing and payment were governed by the terms of the individual's insurance documents, and the insurance company administering the plan had the authority, responsibility, and discretion to make coverage determinations and to process and make payments on claims.

11. Chapter 817 of the Florida Statutes, known as the "Florida Patient Brokering Act," made it a felony for any person, health care provider, or health care facility, including any licensed substance abuse service provider, to: "(a) Offer or pay any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, to induce the referral of patients or patronage to or from a health care provider or health care facility; (b) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for referring patients or patronage to or from a health care provider or health care facility; (c) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for the acceptance or acknowledgement of treatment from a health care provider or health care facility; or (d) Aid, abet, advise, or otherwise participate in the conduct prohibited under paragraph (a), paragraph (b), or paragraph (c)." Fla. Stat. § 817.505.

12. Florida law also stated that it "shall constitute a material omission and insurance fraud . . . for any service provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if such provider has agreed with the insured or intends to waive deductibles or copayments, or does not for any other reason intend to collect the total amount of such charge." Fla. Stat. § 817.234(7)(a).

13. Under state and federal law, health benefit plans were only responsible for claims for services that: (a) were "medically necessary," (b) were actually and lawfully rendered; (c) were provided by a properly licensed service provider, and (d) complied with the terms of the health care plan, including the obligation to pay co-insurance and deductibles.

14. Bodily fluid testing could be used to detect recent drug or alcohol use by a client by conducting various tests on a client's urine, blood, and saliva. Urine Analysis or urinalysis ("UA") testing complexity ranged from screening tests – also known as point of care ("POC") testing – which provided instant results, to confirmatory testing, which was sent to a laboratory, for more complex analysis. Laboratories could also conduct complex analysis on blood and saliva samples.

15. Like other medical tests, bodily fluid testing could be billed to insurance and reimbursed pursuant to the terms of the insurance policy. Insurance companies were only responsible for claims for testing that were "medically necessary," actually performed, properly prescribed, and lawfully conducted by a properly licensed service provider, and conducted and billed in compliance with the law and the terms of the health care plan, including the obligation to pay co-insurance.

16. POC urine testing involved collecting a client's urine in a specific cup designed for testing. The specimen was analyzed using a color banded or numbered dipstick, allowing for visual positive or negative results. POC urine testing usually tested for the presence of 9 to 13 specific types of drugs, including the most common drugs of abuse like cocaine, opioids, and heroin. POC tests typically cost between $5 and $10 and could be read easily by a layperson.

17. Confirmatory testing, conducted in a laboratory setting, made use of gas liquid

chromatography, mass spectrometry, and/or gas chromatography, or high performance liquid chromatography, to analyze the client's urine, blood, or saliva specimen. These techniques were highly sensitive, and accurately and definitively identified specific substances and the quantitative concentrations of the drugs or their metabolites. Confirmatory testing could detect a wider range of controlled substances and metabolites – up to 100 or more substances, referred to as "panels." The prescribing physician could request that the lab test only for those panels that directly related to a client's drug use history. Laboratories billed each panel separately, so prescribing more panels for testing resulted in higher bills.

18. Reflections was located at 5100 Coconut Creek Parkway, Margate, Florida, in Broward County, in the Southern District of Florida. Reflections purported to operate as a licensed "substance abuse service provider" or "treatment center," that is, it purportedly offered clinical treatment services for persons suffering from alcohol and drug addiction. As noted above, although co-conspirator Kenneth Chatman had a federal criminal conviction that prohibited him from owning or operating a substance abuse service provider, Chatman owned and served as the Chief Operating Officer of Reflections, including making all financial decisions.

19. Journey was located at 7451 S. Military Trail, Lake Worth, Florida, in Palm Beach County, in the Southern District of Florida. Journey purported to operate as a licensed "substance abuse service provider" or "treatment center," that is, it purportedly offered clinical treatment services for persons suffering from alcohol and drug addiction. As noted above, although co-conspirator Kenneth Chatman had a federal criminal conviction that prohibited him from owning or operating a substance abuse service provider, Chatman owned and served as the Chief Operating Officer of Journey, including making all financial decisions.

20. Defendant Barry Gregory was a Licensed Mental Health Counselor in the State of Florida, and owned and operated a consulting firm named Recovery Consulting Solutions that assisted substance abuse service providers in preparing and filing applications for licensure. The defendant was not a medical doctor and was not authorized to write prescriptions or statements of medical necessity for laboratory testing.

21. In July 2015, the defendant was hired to serve as Clinical Director of Reflections. The defendant held that position until the end of January, 2016. As Clinical Director, the defendant was responsible for supervising clinical services, including regularly reviewing the work performed by subordinate employees. Under state law, "clinical services" included screening, assessment, placement, treatment planning, counseling, and case management. Fla. Admin. Code §§ 65D-30.002(12), 65D-30.004(32).

22. While serving as Clinical Director of Reflections, the defendant assisted Kenneth Chatman in obtaining full licensure for Reflections from the Florida Department of Children and Families ("DCF"). Prior to the defendant's employment, Reflections had received two probationary licenses. The defendant also assisted Kenneth Chatman and Reflections in filing an application to move Reflections to a new location. The defendant knew that Kenneth Chatman was the true owner of Reflections and had a criminal history that prohibited him from owning and operating Reflections, so the defendant assisted Kenneth Chatman in filing applications in the name of co-conspirator Laura Chatman to allow Reflections to obtain DCF licensure, which

was needed to bill insurance companies. The defendant assisted Laura Chatman in signing and submitting documents to DCF and appearing at Reflections for inspections by DCF and other accrediting agencies in order to conceal Kenneth Chatman's ownership and management of Reflections.

23. In July 2016, the defendant was hired by Kenneth Chatman to serve as a consultant and as Clinical Director to Journey. Through his employment, the defendant assisted Kenneth Chatman in obtaining full licensure for Journey from DCF. The defendant knew that Kenneth Chatman was the true owner of Journey and had a criminal history that prohibited him from owning and operating Journey, so the defendant assisted Kenneth Chatman in filing applications in the name of co-conspirator Laura Chatman to allow Journey to obtain DCF licensure, which was needed to bill insurance companies. The defendant assisted Laura Chatman in signing and submitting documents to DCF and appearing at Journey for inspections by DCF and other accrediting agencies in order to conceal Kenneth Chatman's ownership and management of Journey.

24. Kenneth Chatman and other co-conspirators, including Fransesia Davis, owned and operated a series of "recovery residences," also known as "sober homes." The defendant was aware that Kenneth Chatman was the true owner of some of these sober homes, but they were placed in other people's names in an attempt to hide Chatman's true ownership and control over the businesses. Other sober homes were owned by third parties. The defendant knew that Kenneth Chatman paid kickbacks and bribes to sober home owners for referring their residents to Reflections and Journey for treatment, and that these kickbacks and bribes were disguised as "case management fees," "consulting fees," "marketing fees," and "commissions." The co-conspirator sober home owners met with Chatman on a weekly basis to collect their kickbacks and bribes, which were paid based on the number of insured patients that received treatment each week.

25. The defendant further knew that bribes and kickbacks were paid to insured patients who attended treatment, in the form of free or reduced rent, cigarettes, and other items.

26. Instead of defendant Gregory using his clinical expertise and his individual assessments of patients to decide what type of treatment and laboratory testing was needed by each patient, Kenneth Chatman dictated which patients were admitted and discharged and the type and frequency of different types of lab testing that would be performed based upon the kickbacks and bribes that he was receiving from different clinical laboratories. Chatman dictated that confirmatory urine drug testing on dozens of panels for street and prescription drugs would be performed three days per week, duplicative saliva drug testing would occur, and every patient would receive DNA and allergy testing regardless of whether patients complained of allergies.

27. The defendant knew, based upon drug test results, patient statements, and observation, that Reflections and Journey patients were continuing to use controlled substances and that Kenneth Chatman was advising patients that they were allowed to continue using controlled substances. On most occasions, the defendant and clinical staff simply allowed the behavior to continue. On other occasions, defendant Gregory would recommend referring relapsed patients to detox or other facilities that would truly assist the patients in achieving sobriety. Co-conspirator Chatman, who had no medical or clinical training, would overrule

defendant Gregory's recommendations because discharging the patients would end Chatman's ability to bill the patients' insurance plans, and Gregory estimated that as many as 90% of the patients continued to use controlled substances while purportedly obtaining treatment.

28. With regard to bodily fluid testing, based upon Chatman's instructions, "standing orders" were prepared and provided by clinical labs. Rather than selecting individual drug tests based upon a patient's drug use history, period of sobriety, or any other individualized evaluation, Reflections' Medical Directors, signed these "standing orders" that authorized testing patients before the patients had even seen the doctor, including conducting duplicate tests of patients' urine and saliva. To conceal the fact that these tests were not medically necessary, defendant Gregory signed "medical necessity statements" after the fact that falsely stated that the testing was needed, that defendant Gregory reviewed the test results, and that the tests were used to direct the course of the patients' treatment, despite the fact that he was not a medical doctor and had no authority to prescribe lab testing. In truth, defendant Gregory did not timely monitor the drug test results and knew that they were not used by the medical directors or the clinicians to direct the patients' treatment. Defendant Gregory admitted that the drug testing was "useless" because most of the patients at Reflections and Journey were continuing to abuse drugs. Gregory knew that insurance claims for the medically unnecessary tests that he prescribed would be submitted to the patients' insurance companies.

29. In many instances, the sober home residents did not attend the purported treatment sessions at Reflections and Journey and did not provide bodily fluid samples for drug testing. On some of these occasions, co-conspirators would forge patients' signatures on sign-in sheets to make it appear as though absent patients had attended treatment and submitted bodily fluids samples. Members of the clinical staff would "cut and paste" to create treatment notes that made it appear as though the absent patients were present. As Clinical Director, the defendant reviewed the treatment notes that were prepared by other clinicians and was aware that duplicative notes were included in multiple patient files.

30. Gregory knew that insurance claims based upon the medically unnecessary drug testing and treatment were submitted to patients' health insurance plans. During the period of Gregory's terms as Clinical Director at Reflections and Journey, the treatment centers received reimbursements from insurance companies in excess of $2 million.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: 2/16/2017   By: _____
A. MARIE VILLAFAÑA
ASSISTANT UNITED STATES ATTORNEY

Date: 2/16/17   By: _____
VALENTIN RODRIGUEZ, ESQ.
ATTORNEY FOR DEFENDANT

Date: 2/16/17   By: _____
BARRY GREGORY, DEFENDANT

Page 6 of 6